**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: IMPRELIS HERBICIDE MARKETING, | : | |
| SALES PRACTICES AND PRODUCTS LIABILITY | : | |
| LITIGATION | : | MDL No. 2284 |
| | : | 11-md-02284 |
| _____ | : | |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| ALL ACTIONS | : | |

## MEMORANDUM

PRATTER, J.                                                          OCTOBER 17, 2013

This multidistrict litigation poses the question:  If a tree falls in the forest, was it caused by DuPont's herbicide, Imprelis?  Rather than squarely answer that question, the parties reached a class action settlement after months of negotiation, and the Court preliminarily approved that settlement in February of 2013.  In the months that followed, the parties engaged in a wide-ranging notice program, leading to the filing of over 37,000 claims, 581 opt outs, and 24 timely objections.  Now Settlement Counsel has moved for final approval of the settlement and for attorneys' fees.  Because the settlement meets the Third Circuit's *Girsh* factors and the proposed attorneys' fees are reasonable, the Court will grant the parties' motions.

## BACKGROUND

In the fall of 2010, DuPont introduced Imprelis, a new herbicide designed to selectively kill unwanted weeds without harming non-target vegetation.  After widespread reports of damage to non-target vegetation, the EPA began investigating Imprelis, leading to lawsuits, a suspension of Imprelis sales, and an EPA order preventing DuPont from selling Imprelis.  In September 2011, DuPont started its own Claim Resolution Process to compensate victims of

Imprelis damage.  Despite this voluntary process, Plaintiffs continued to pursue their lawsuits, alleging consumer fraud/protection act violations, breach of express and/or implied warranty, negligence, strict products liability, nuisance, and trespass claims based on the laws of numerous states.[1]  After months of settlement discussions, including mediation before a retired magistrate judge, the parties came to a settlement agreement, which is discussed in further detail below.[2]

### A.    Class Definition and Settlement Terms

The settlement classes consist of:

<u>Property Owner Class (Class 1):</u>

All persons or entities who (A) own or owned property in the United States to which Imprelis was applied from August 31, 2010 through August 21, 2011, or (b) own or owned property in the United States adjacent to property to which Imprelis was applied from August 31, 2010 through August 21, 2011 and whose trees show damage from Imprelis on or before the date of entry of the Preliminary Approval Order ("Adjacent Property Owner").  Excluded from Class 1 are (1) any Judges to whom this Action is assigned and any members of their immediate families and (2) any property owners whose properties were used for the testing of Imprelis or developmental formulations containing the same active ingredient.

---

[1]    The states identified in the Amended Master Class Action Complaint include Delaware, Connecticut, Indiana, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, South Dakota, and Wisconsin.  Imprelis was approved for sale in all states except New York and California.

[2]    In light of the multitude of lawsuits filed in federal courts across the country, many of which were styled as class action lawsuits, and upon the motions of counsel in several of those actions, the Judicial Panel on Multidistrict Litigation consolidated and transferred all pending federal Imprelis suits to this Court, giving the Court jurisdiction over pretrial proceedings in the transferred actions.  *See* 28 U.S.C. § 1407; Transfer Order (Docket No. 1).  A district judge exercising authority over cases transferred for pretrial proceedings "inherits the entire pretrial jurisdiction that the transferor district judge would have exercised if the transfer had not occurred."  15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3866 (3d ed. 2010).  Settlement proceedings, in particular, are commonly conducted before MDL courts, and the Third Circuit Court of Appeals has held that such proceedings are squarely under the umbrella of pretrial proceedings over which transferee courts have jurisdiction.  *See In re Patenaude*, 210 F.3d 135, 144-45 (3d Cir. 2000).  Indeed, "[i]t is established Panel and court of appeals precedent that settlement matters are appropriate pretrial proceedings subject to centralization under § 1407."  *In re Managed Care Litig.*, 246 F. Supp. 2d 1363, 1365 (Jud. Pan. Mult. Lit.,2003).

Applicator Class (Class 2):

All persons or entities that, from August 31, 2010 through August 21, 2011, purchased Imprelis (and/or received Imprelis directly or indirectly from a purchaser) and applied it to property in the United States as part of their normal business, other than property that they own or owned ("Applicators").  Excluded from Class 2 are any Judges to whom this Action is assigned and any members of their immediate family.

Golf Courses and Other Self Applicators Class (Class 3):

All persons or entities that, from August 31, 2010 through August 21, 2011, purchased Imprelis (and/or received Imprelis directly or indirectly from a purchaser) and applied it to properties in the United States that they own or owned ("Self Applicators").  Excluded from Class 3 are any Judges to whom this Action is assigned and any members of their immediate family.

Under the proposed settlement, class members will receive the following:  Members of the Property Owner Class will receive a warranty on replacement trees, which will expire on May 31, 2015.  DuPont will also remove damaged trees or provide compensation for their removal under specified circumstances and will pay for damaged trees pursuant to the schedule set out in Exhibit 15 to the Settlement Agreement.[3]  DuPont will also pay each Property Owner Class Member certain tree care and maintenance payments pursuant to the schedule set forth in Exhibit 18 to the Settlement Agreement, as well as an additional payment for incidental damages in an amount equal to 15% of the total value of the other payments and services provided to that Class Member under the settlement.  Should Class Members disagree with the settlement amount offered, they may appeal their offer to a panel of arborists.  Property Owner class members who sell their property before executing a claims resolution agreement will only be entitled to the costs of tree removal incurred plus 15% of that amount in incidental damages, although individuals who purchase the affected property will be entitled to the full range of benefits

---

[3]     Payments for replacement trees may be used in any way a class member wishes.  DuPont has entered into agreements with various Qualified Tree Providers who have set prices for replacement trees under 20 feet tall, so that class members are guaranteed to be able to purchase such trees up to 20 feet tall for the settlement amounts they receive.

offered as part of the settlement.  Finally, Property Owner Class Members will not be releasing any claims for environmental or personal injury damages by participating in the settlement.

Members of the Applicator Class will receive compensation for customer site visits, field work, and other such expenses incurred prior to September 6, 2011, as well as continued compensation for such activities if they elect to participate in the claims process.  To the extent they have not already done so, Applicator Class Members may also participate in the Imprelis recall program.  By participating in the proposed settlement, applicators will not release their rights to recover for lost profits for business interruption or for damages arising from suits brought against them by third parties relating to Imprelis.[4]  Members of the Self Applicator Class will receive all the benefits provided to members of the Property Owner Class, plus reimbursement for time and expenses spent investigating and documenting Imprelis damage, subject to a $2,000 maximum for such reimbursement claims.

DuPont has paid, and will continue to pay, all notice and claims administration (inspections, processing, etc.) expenses.  The settlement fund does not have a cap on the number of claims or dollar amount that may be spent on class members claims.  Also, attorneys' fees, which Settlement Class Counsel seek in the amount of $6.5 million in fees and $500,000 in costs, will come directly from DuPont, rather than being deducted from a settlement fund or from any money otherwise earmarked for class members.  Class representatives also seek bonuses for service to the class ($1500 for individual property owners, $2500 for commercial entities), and these amounts will likewise not detract from or be debited against other class funds.

DuPont has already begun to pay claims submitted through the settlement.  As of the date the approval motion was filed, DuPont had paid out $377,706,351.64 to 24,524 claimants.

---

[4]     As part of the settlement release, Property Owner class members agree to release Imprelis-related claims against DuPont and any other class members, like lawn care operators.

DISCUSSION

    **A.**    **Motion for Final Approval**

        1.  <u>Rule 23(a) and (b)</u>

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

> (1)    The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> (2)    If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3)    The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
> (4)    If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
> (5)    Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection maybe withdrawn only with the court's approval.

*Id.* The "'[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23.'" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). "'The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court.'" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

Where, as here, the Court has not already certified a class prior to evaluating a settlement, the Court initially must determine whether the proposed settlement classes satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) ("[A] district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.").  The Third Circuit Court of Appeals summarized the demands of Rule 23 as follows:

> Rule 23(a) contains four threshold requirements, which every putative class must satisfy:
>
> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613.  Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b) . . .
>
> [C]ertification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 180 (3d Cir. 1994).  These twin requirements are commonly referred to as predominance and superiority.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

### a.  Numerosity

Under Federal Rule of Civil Procedure 23(a), the first factor to consider in certifying a class is whether "the class is so numerous that joinder of all members is impracticable."  Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are]

plaintiff[s] required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999) (citation omitted); *see also* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005) ("'[I]mpracticable' does not mean 'impossible.' The representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class."); 1 A. Conte & H. Newberg, *Class Actions* § 3:14 (5th ed. 2011) ("Plaintiffs bear the burden of demonstrating that joinder is impracticable, but *impracticable* does not mean *impossible*.").  "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citation omitted).  Because there are at least tens of thousands of class members, this factor is easily met.

> ### b.   Commonality

Under Federal Rule of Civil Procedure 23(a), the second factor to consider in certifying a class is whether "there are questions of law or fact common to the class."  The commonality prerequisite does not require that all members of the prospective class share identical claims. *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (relying on *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)).  Rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  As the Supreme Court explained: "'What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of*

*Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original).  Certainly, there are

common questions relating to the effects of Imprelis generally, how it was marketed and tested,

and other similar fact questions that center on DuPont's actions, as well as the legal implications

of those facts.  Thus, this factor is satisfied for purposes of certifying the settlement classes.

> c.   *Typicality*

The third 23(a) factor is typicality, *i.e.*, whether "the claims or defenses of the

representative parties are typical of the claims or defenses of the class."  "If the claims of the

named plaintiffs and putative class members involve the same conduct by the defendant,

typicality is established regardless of factual differences."  *Newton v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001).  Here, class representatives from a

variety of states include personal and commercial property owners, lawn care companies, former

property owners, and an adjacent property owner.  Each seeks to hold DuPont liable for damages

related to the application of Imprelis.  Thus, their claims are typical of the classes delineated for

the proposed settlement.

> d.   *Adequacy of Representation*

The final Rule 23(a) factor focuses on adequacy – whether "the representative parties will

fairly and adequately protect the interests of the class."  This means both that class

representatives do not have interests antagonistic to the class and that class counsel are

sufficiently skilled and experienced to litigate the case.  *See Dewey v. Volkswagen*

*Aktiengesellschaft*, 681 F.3d 170, 182 (3d Cir. 2012) (the adequacy of the representative parties

requirement, "has two components: (1) concerning the experience and performance of class

counsel; and (2) concerning the interests and incentives of the representative plaintiffs.").

Essentially, the inquiry into the adequacy of the representative parties examines whether "the

putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine*, 846 F.2d 169 at 179 (citations omitted); *see also Dewey*, 681 F.3d at 182 (recognizing that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class").  In other words, "Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4) cannot be satisfied.  *Dewey*, 681 F.3d at 184-85.  There are no apparent conflicts between named class representatives and other potential class members.

The Court analyzes the capabilities and performance of Settlement Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g).  *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)." (citing Fed. R. Civ. P. 23(g), 2003 advisory comm. note).  Rule 23(g) requires consideration of four factors:  "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation" and "the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  The Court "must also ensure that '[c]lass counsel [will] fairly and adequately represent the interests of the class.'"  *Sheinberg*, 606 F.3d at 132-33 (quoting Fed. R.

Civ. P. 23(g)(4)).  Although formal discovery has not yet occurred, Settlement Counsel has

already analyzed hundreds of thousands of pages of documents, deposed a key DuPont witness,

and retained several relevant experts to fully investigate the potential claims in this action.

Moreover, Settlement Counsel were among the first to file Imprelis cases on behalf of various

clients.  Each is well-versed in complex litigation, in particular in the types of products liability

claims asserted here.  Indeed, their experience with and knowledge of applicable law is evident

in the comprehensive statement of states' laws filed by Settlement Counsel, which outlines the

various causes of action asserted by the class under a variety of laws.  *See* Docket No. 65.  At the

earliest stages of the case when the Court undertook to evaluate the various candidates for class

counsel positions the Court took special care to study and test counsel's various attributes and

skills before authorizing them to proceed.  Finally, Settlement Counsel has already committed

substantial resources to the prosecution of this action and no doubt would continue to do so if

necessary.  Therefore, this final factor weighs in favor of conditionally certifying a settlement

class.

### e. *Predominance and Superiority*

Under Fed. R. Civ. P. 23(b)(3), a class action may be maintained if common questions of

law or fact predominate questions arguably affecting only individuals.  "Rule 23(b)(3)'s

predominance requirement imposes a more rigorous obligation [than Rule 23(a)(2)'s

commonality element] upon a reviewing court to ensure that issues common to the class

predominate over those affecting only individual class members."  *Sullivan*, 667 F.3d at 297

(citing *Ins. Broker.*, 579 F.3d at 266).  Third Circuit precedent "provides that the focus of the

predominance inquiry is on whether the defendant's conduct was common as to all of the class

members, and whether all of the class members were harmed by the defendant's conduct."  *Id.*

Because DuPont's actions in testing and marketing Imprelis and the legal consequences of those actions are at the heart of all of Plaintiffs' claims, Plaintiffs have met their burden to show predominance for the purposes of conditional class certification.

The second inquiry under Rule 23(b)(3) deals with whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Several factors are relevant to the superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Prudential*, 148 F.3d at 316 (internal quotations omitted).

The Court makes no determination at this time concerning the manageability of the Plaintiffs' suit as a class action if this action were to go to trial in a single forum or, to the extent this possibility remains, be remanded to the various transferor courts. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

Here, given the very large number of potential plaintiffs (many with relatively small claims for damages), the number of suits filed, and the relatively early stage of these individual actions, a class action seems to be a superior vehicle for this suit, particularly at the settlement stage.

2. Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d at 306. Fed. R. Civ. P. 23 sets forth two provisions concerning notice to class members.

First, Fed. R. Civ. P. 23(c)(2)(B) requires that class members be given the best notice practicable under the circumstances, including individual notice to all potential class members identifiable through reasonable effort. This notice is to be given to all potential members of a Rule 23(b)(3) class. *Prudential*, 148 F.3d at 326. Specifically, the Rule provides that such notice

> must, in clear, concise and plain language, state: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) the class member's right to enter an appearance by an attorney; (v) the class member's right to be excluded from the class; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of settlement on class members.

Fed. R. Civ. P. 23(c)(2)(B).

Second, Rule 23(e) requires all members of the class be notified of the terms of any proposed settlement. Fed. R. Civ. P. 23(e). This "notice is designed to summarize the litigation and the settlement" and "'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.'" *Prudential*, 148 F.3d at 327 (quoting 2 Newberg, *supra*, § 8.32 at 8-109).

In this action, the parties hired Katherine Kinsella, a notice expert, to design a program that included direct mail to all identified class members (those who had submitted claims to

DuPont), as well as publication in print,[5] online,[6] and on television.[7]  Nearly 69,000 potential

class members received direct notice of the settlement, and tens of thousands of others were

notified by publication.  As of July 31, 2013, 108,416 unique visitors had viewed the Settlement

website and 12,981 had called the Settlement hotline.  The notices themselves explained in plain

language the settlement and the procedures necessary to file a claim, opt out, or object to the

settlement.  Thus, the Court finds that the parties' comprehensive notice program, which the

Court also reviewed in advance, satisfies Rules 23(c)(2)(B) and (e).

        3.  *Girsh* Factors

The Third Circuit Court of Appeals has set forth nine factors to be considered when

determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation;(2) the reaction of
> the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through trial;
> (7) the ability of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible recovery; (9) the
> range of reasonableness of the settlement fund to a possible recovery in light of all
> the attendant risks of litigation…

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and punctuation marks

omitted); *Prudential*, 148 F.3d at 317.

In *Prudential*, the Third Circuit Court of Appeals also identified additional, non-

exclusive factors for courts to consider for a "thoroughgoing analysis of settlement terms."  *See*

---

[5]      The print advertisements appeared in widely circulated publications like *Parade*, *People*, *Better Homes and Gardens*, *Time*, and others geared toward adults age 35 and over.

[6]      Online advertisements appeared on AOL, Facebook, Yahoo!, Google, and other sites.

[7]      Commercials appeared at a variety of times of day in 46 targeted Market Areas throughout the United States.

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).  Those factors, which often

overlap with the *Girsh* factors, include:

> [T]he maturity of the underlying substantive issues, as measured by experience in
> adjudicating individual actions, the development of scientific knowledge, the extent of
> discovery on the merits, and other factors that bear on the ability to assess the probable
> outcome of a trial on the merits of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses; the comparison between the
> results achieved by the settlement for individual class or subclass members and the
> results achieved – or likely to be achieved – for other claimants; whether class or subclass
> members are accorded the right to opt out of the settlement; whether any provision for
> attorneys' fees are reasonable; and whether the procedure for processing individual
> claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.  While the Court must make findings as to the *Girsh* factors, the

*Prudential* factors are illustrative of additional factors that may be useful and do not trigger a

requirement that specific findings be made.

The Third Circuit Court of Appeals has held that although there is an overriding public

interest in settling class actions, district courts should apply "an even more rigorous, heightened

standard in cases where settlement negotiations precede class certification, and approval for

settlement and class certification are sought simultaneously." *Pet Food*, 629 F.3d at 350 (internal

quotations omitted).  Thus, the Court must make an independent analysis of all of the *Girsh*

factors (and the *Prudential* factors, as appropriate) and may affirmatively seek out information to

the extent that the parties have either not supplied it or have provided only conclusory

statements.  *See id.* at 350-51.  On the other hand, because a settlement represents the result of a

process by which opposing parties attempt to weigh and balance the factual and legal issues that

neither side chooses to risk taking to final resolution, courts have given considerable weight to

the views of experienced counsel as to the merits of a settlement.  *See Cotton v. Hinton*, 559 F.2d

1326, 1330 (5th Cir. 1977); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa.

1995) ("Significant weight should be attributed to the belief of experienced counsel that

settlement is in the best interest of the class") (internal quotation omitted).  Moreover, this settlement is entitled to an initial presumption of fairness because "(1) the settlement negotiations occurred at arms' length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (internal quotation omitted).

### a.   *The Complexity, Expense and Likely Duration of the Litigation*

The first *Girsh* factor takes into account the "probable costs, in both time and money, of continued litigation."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (internal quotation omitted).  As to this factor, the Plaintiffs argue that continued litigation would involve the analysis of millions of entries in DuPont's claims resolution process database, a host of pretrial motions, and the use of several experts.  They also argue that appeals would likely follow any trial on the merits.  Especially given the early resolution reached by the parties, which has saved both sides from incurring significant additional expense for experts, for discovery compliance, for legal fees and time and expense charges with such standard litigation requirements, this factor weighs heavily in favor of the settlement.

### b.   *The Reaction of the Class to the Settlement*

Potential class members numbering as many as 68,892 received direct notice, and many more potential class members were notified via publication; 37,824 Property Owner claims were made as of the date of the filing of the approval motion; and 167 Lawn Care Operator or Self-Applicator claims were also received as of that date.  A total of twenty four timely objections were received,[8] and 581 plaintiffs opted out of the settlement.[9]  Thus, the percentage of objectors

---

[8]      Four others filed late objections, which were dated and/or received after the August 21, 2013 objection deadline.  These late objections were more in the nature of requests for the Court to intervene in

and opt-outs – less than one percent – is extremely low, considering the large number of class

members, and is well in line with previous cases in this circuit in which this factor was counted

in favor of settlement approval. *See, e.g., Prudential*, 148 F.3d at 318 (affirming district court's

conclusion that class reaction was favorable when 19,000 out of 8,000,000 class members opted

out and 300 objected); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D 249, 269 (E.D. Pa.

2012) (characterizing an opt out rate of 1.14% of notice addressees as *de minimis*); *In re Ikon*

*Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000) (approving settlement with

2,500 opt out requests from an original notice to 140,000 settlement class members).

Nonetheless, the Court will address each of the objections raised to the settlement.

### i.   *Objections to the settlement amount*

Most of the objectors take issue with the amount of compensation they will receive under

the settlement and ask for, for instance, compensation for loss of property value, compensation

for vegetation other than trees, more money for large trees,[10] punitive damages, additional

maintenance compensation, and/or compensation for loss of tree growth.  These objections do

---

disputes between claimants and the claims administrators or late claim requests.  At the Final Fairness
Hearing, counsel for DuPont agreed to accept claims from any objectors seeking to submit a late claim,
provided that they did so in writing before the date of the Final Fairness Hearing.  *See* 9/27/13 Tr. at 18-
21:18-24.  Thus, to the extent any of the objections were late claims submissions, those are moot.

[9]      Of the 581 opt out requests, several failed to include required information.  DuPont has agreed to
honor each of these timely opt out requests, despite the procedural defects.  *See* 9/27/13 Tr. at 11:12-
13:15.  In addition, the Souders plaintiffs objected to the settlement and sought to opt out after the
deadline.  The parties have asked the Court to approve their opt out request, given that they had hired an
attorney to submit a timely opt out request and, through no fault of their own, he failed to do so.  The
Court will approve the request.  Given this, their objections to the settlement are deemed moot.

[10]      Many of the complaints focus on the inadequacy of compensation for very tall trees.  As fully
discussed at the Final Fairness Hearing, replacement trees in heights taller than 20 feet are scarce, and
actually replacing such trees is at the very least a complicated, if not impossible, process.  *See* 9/27/13 Tr.
at 121:9-124:25.  Even assuming that a tree of comparable size can be located, transported to the site, and
replanted, there is little or no guarantee that the replanted tree will thrive, making it quite possible that the
whole exercise will have been fruitless.  Because of the scarcity of trees of that size and the complexity of
the replacement process, the cost of replacing these larger trees is exponentially higher than that of
replanting smaller trees.  Thus, the settlement values for those trees are understandably lower than actual
replacement cost.

not sufficiently appreciate the fact that this is a *settlement*, not an award that will necessarily make all of the claimants whole for any damages incurred.  Indeed, the very nature of a "settlement" is that it represents a compromise, not full compensation for all potential damages that could be awarded in a successful lawsuit.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *Henderson v. Volvo Cars of N. Am.*, Civil Action No. 09-4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) (collecting cases rejecting objections to class settlements that merely complained about the lack of full relief and holding that "[o]bjections based solely on the amount of the award lack merit").

        *ii.*        *Late Opt-outs/claims, appeal requests, and process complaints*

About half of the objections really are late requests to opt out, claims appeal requests (*e.g.*, complaints that not all affected trees were included in the settlement offer), late claims submissions, or complaints about the claims process itself.  As previously noted, the Souders Plaintiffs' late opt out request will be granted, and the late claims submissions or requests to submit untimely claims will be honored by DuPont, so all of those objections are moot.  To the extent that the objections seek to appeal the settlement amounts offered or to complain about delayed responses during the claims process, these objections do not indicate that the settlement itself is unfair or unreasonable.[11]  Settlement Counsel has and will continue to assist class

---

[11]      One of the Prudential factors is "whether the procedure for processing individual claims under the settlement is fair and reasonable."  *See Prudential*, 148 F.3d at 323.  Given the availability of an appeals process for individual claims, Settlement Counsel's commitment to facilitate the claims process and advocate on behalf of class members, and DuPont's willingness to begin paying claims even before the settlement has been finalized, the Court is satisfied that this *Prudential* factor has been met.

members with the claims process, and an appeals process is already built in to the settlement itself.

### iii. Warranty issues and other misunderstandings

Other objectors misunderstand how the settlement process works.  For instance, a few objectors claim that the settlement does not provide for damages to people and animals, but those types of claims are specifically excluded from the settlement releases.  Thus, to the extent that any such damage occurs (and to the Court's knowledge, no one has reported or sued for actual damage of that nature), class members are still free to bring lawsuits seeking compensation for personal or environmental injury.

Other objectors misunderstand or question the length of the warranty.  For instance, a handful of objectors claim that their property evaluations were made too early, and that Imprelis damage is now much more extensive.  They also contend that the settlement provides no warranty for new plantings.  Under the warranty, however, new damage can be reported to DuPont for additional compensation, and new plantings are covered.  More substantive objections question the length of the warranty and also seek soil testing and remediation. Objector Ray Majcher appeared at the Final Fairness Hearing and offered a presentation focused largely on his considerable concern that Imprelis will harm his heavily wooded property long after the warranty expires.  The warranty issue was hotly contested by the parties in negotiating the settlement, and the additional warranty time gained through the settlement (through May 31, 2015 – an extra 18 months, as compared to the warranty offered under DuPont's original claims resolution process) was based on advice from Plaintiffs' experts who opined that a warranty of this length is sufficient to cover all Imprelis-related damage, based on Imprelis's biodegradation process and latency period.  *See* Pls.' Reply, Docket No. 213, Exs. B, C.  In fact, a recent study

done by the Indiana Office of the State Chemist showed that of 11 sampled properties to which Imprelis was applied, only 5 still had detectable amounts of Imprelis in 2013, and the detectable amounts in those lawns were insignificant.  *See id.*, Ex. E.  The Court understands that there is some uncertainty as to the long term effect of Imprelis, particularly as Imprelis in trees dissipates more slowly than Imprelis in soil.  However, the strength of the Plaintiffs' experts' endorsement of the warranty should give class members some comfort, and class members once more are reminded that a settlement does not by its very nature guarantee full compensation for all harm.

iv.   *Lawn Care Operator ("LCO") objections*

The sole lawn care operator objector, Lawn Cure of Southern Indiana, complains that it has continued to do site visits and deal with customer issues but has not received reimbursement for this time.  The settlement provides that LCOs will be reimbursed for these activities through September 6, 2011 and may continue to be reimbursed for at least some of these costs if they elect to participate as Track 1 LCOs or qualifying tree providers in the claims process.  To the extent that this LCO complains of business interruption/lost profits, it may sue for these damages separately, as it is not waiving its rights to assert those claims by participating in the settlement.

Lawn Cure also objects to the settlement because it fears future litigation by clients with Imprelis-damaged lawns, but the settlement provides that LCOs may seek indemnification from DuPont if such a suit is filed and that class members who do not opt out of the settlement release their Imprelis claims against other class members (like LCOs), as well as against DuPont.  Finally, Lawn Cure complains that many of its customers are just now seeing Imprelis-related damage.  At least two of its customers have submitted late claims based on this newly discovered damage, both of which will be honored by DuPont.  Moreover, the warranty will protect class members from future Imprelis damage.

v.      *Notice program*

A few objectors quibble with the adequacy of the notice, claiming that they did not

receive notice in time to file a claim.  As already discussed, the notice program in this case was

comprehensive and led to tens of thousands of properly filed claims, which demonstrate that at

least those class members received notice in a timely fashion, certainly outweigh the very few

objectors who claim that they were unaware of the settlement until after the claims deadline.

Moreover, the late claimants who, on or before the date of the Final Fairness Hearing, provided

notice in writing of their desire to submit claims will be allowed to participate in the claims

process.  *See* 9/27/13 Tr. at 18-21:18-24.

vi.     *Former property owners*

Finally, the Kipphorn objectors claim that the treatment of former property owners in the

proposed settlement is unfair, in that they are only entitled to reimbursement of tree removal

costs plus 15% of any such costs.[12]  Plaintiffs argue that because Imprelis damage manifests over

---

[12]     The Kipphorns also moved for discovery.  Their first such motion was denied without prejudice
after a telephone conference during which their counsel was encouraged to informally discuss the requests
with DuPont and Settlement Counsel.  A day before the Final Fairness Hearing, they renewed their
motion for discovery, seeking much of the same information they sought in their first motion.  The
Kipphorns, however, have failed to demonstrate that they have a pressing need for any discovery in order
to raise their objection, which rests primarily on legal, rather than factual, grounds.  Much of the
information they seek, including the exact number of former property owners who are class members, is
not in the possession of any parties.  Indeed, DuPont does not know the precise number of class members,
let alone how many of them sold their properties after the application of Imprelis.  *See* 9/27/13 Tr. at
74:11-75:11, 78:10-19.  The Kipphorns attempted to present, for "judicial notice," statistics relating to the
number of single family residences in the United States and the number of such residences sold in the last
few years to prove that the number of former property owners included in Class 1 is high.  Even if the
Court were to accept these statistics, however, it would not change the Court's analysis here.
     In conjunction with their request for discovery, the Kipphorns also seek an evidentiary hearing.
Without their requested discovery, the Kipphorns had a full opportunity to present their arguments to the
Court, both in their paper submissions and at the Final Fairness Hearing.  Indeed, although the Court
allocated five minutes at the Final Fairness Hearing to each objector, counsel for the Kipphorns was
permitted to fully present the Kipphorns' objections, to speak for considerably longer than the allotted
time, and to respond to Settlement Counsel's arguments with respect to their objection.  Having fully
considered their discovery demands, the Court will deny the Kipphorns' motion.

time, settlement proceeds should run with the land, while the Kipphorns contend that Imprelis damage is properly characterized as permanent damage, compensation for which, under a trespass or nuisance theory, belongs to the property owner at the time the damage occurred.[13] Plaintiffs and DuPont also argue that paying former owners for ongoing damage gives them a windfall and leaves current owners with no recourse for damages they are actually suffering. Plaintiffs point to other cases involving property damage in which damages were assigned to current owners, with the exception of costs actually incurred by former owners. *See, e.g., In re Louisiana-Pacific Inner-Seal Siding Litig.*, No. CV95-879-JO, 2004 WL 1246050, at * (D. Or. May 24, 2004) (defining a settlement class as including "the current owner of Property who has not assigned the claim, a subsequent purchaser of Property not subject to a prior assignment of claim, or a former owner of Property who holds a valid assignment of claim or who made a prior unreimbursed repair or replacement").

At the Final Fairness Hearing, aside from speculating, *i.e.*, with no supporting evidence, that they had suffered a loss in property value, the Kipphorns could not identify any damages they had suffered for which they were not reimbursed under the settlement, nor could they offer the Court any suggestions for a method of more equitably allocating settlement proceeds between former and current property owners to account for the gap they claim operates to their financial disadvantage. *See, e.g., Henry v. Sears Roebuck & Co.*, No. 98-CV-4110, 1999 WL

---

[13] All of the cases cited by the parties regarding permanent versus continuing harm deal with claims of trespass and/or nuisance. Neither side cites any cases adopting these concepts in a products liability case, and the Court is unable to find any. Indeed, in one case cited by the Kipphorns, a court distinguished the analysis applicable to trespass/nuisance claims from that applicable to negligence claims: "With trespass and nuisance claims, the analysis of the statute of limitations is different from that of a negligence claim. One must first determine whether the invasion is continuing or is permanent in nature." *Dombrowski v. Gould Electronics, Inc.*, 954 F. Supp. 1006, 1011 (M.D. Pa. 1996) (applying Pennsylvania law). Although there are claims for nuisance and trespass in the Corrected Amended Master Class Action Complaint (Docket No. 123), the majority of the claims sound in products liability or consumer protection.

33496080, at *6 (N.D. Ill. July 23, 1999) (rejecting class settlement objection when objectors had not established that they or any other class members had suffered the damages they contended were missing from the settlement and deeming those additional damages speculative as a result). While the question of whether a plaintiff *could* prove and recover for diminution in property value as an element of damages in an Imprelis case is not before the Court, the fact remains that this Settlement does not offer compensation for that type of damage to *any* class member, but rather uses a different model of damages, focusing on the replacement cost of trees, maintenance of the same, and other similarly concrete measures of damage. The allocation of these damages appears to be equitable – clearly, it would make little sense to award tree maintenance or replacement costs to someone who no longer owns the property on which the trees are (or were) located. Ultimately, then, the Kipphorns' objections are no different from the other objectors who simply wanted more money and will therefore be rejected for the same reasons.[14]

### c.   The Stage of the Proceedings and the Amount of Discovery Completed

This *Girsh* factor requires the Court to evaluate whether Plaintiffs had an "adequate appreciation of the merits of the case before negotiating" settlement. *Prudential*, 148 F.3d at 319 (internal quotation omitted). Settlement Counsel reportedly analyzed about half a million pages of discovery documents, deposed DuPont's Global Technical Product Manager, and retained several experts. Thus, even at this early stage of the proceedings, a reasonable amount of discovery has been done – enough to give both sides a fairly accurate view of the risks of continued litigation.

---

[14]   The Court also notes again that, whether there are hundreds or thousands of former property owners who are class members, only one has objected to the settlement.

   d.  *The Risks of Establishing Liability and Damages and of Maintaining the Class*
       *Action Through Trial*

These three *Girsh* factors require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537.  As to the risks of establishing liability, this factor "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995).  As to damages, this factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238-39 (quoting *Gen. Motors*, 55 F.3d at 816).  Finally, "[b]ecause the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor [concerning the risks of maintaining the class action through trial] measures the likelihood of obtaining and keeping a class certified if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537 (internal quotations omitted).

   With respect to liability and damages, Plaintiffs emphasize, as plaintiffs always do at this point in the analysis of a class action settlement, that even though they believe they would ultimately prevail at trial, there are risks inherent in going to trial against a large company with talented defense counsel.  They also note that proving damages would potentially be complicated and involve a battle of the experts.  Given the variety of state laws under which Plaintiffs bring their claims and the complexity of the scientific issues in this case, the Court agrees that the risks of continued litigation weigh in favor of an early resolution.  Likewise, with respect to the risk of maintaining the class action through trial, the Third Circuit Court of Appeals has recognized that

"[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321.

      *f.   The Ability Of The Defendant To Withstand A Greater Judgment*

Despite the uncapped nature of the Settlement in this case, clearly DuPont is a large corporation and could likely withstand a greater judgment.  Thus, this factor weighs against settlement.

      *g.   The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

"The reasonableness of a proposed settlement depends in part upon a comparison of the present value of the damages the plaintiffs would recover if successful, discounted by the risks of not prevailing."  *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Gen. Motors*, 55 F.3d at 806).  Plaintiffs emphasize that the great costs of continuing litigation, more fully discussed with respect to the risks of proving liability and damages and maintaining a class, would outweigh any potential for greater recovery at trial.  Even estimating the best possible recovery is difficult in this case, for all the reasons noted above with respect to the difficulty of valuing trees taller than twenty feet and because Plaintiffs seek punitive damages, the award of which is nearly impossible to predict.  Thus, the Court accepts that the Settlement here is reasonable, in view of the long, winding and contentious road Plaintiffs would have to travel to recover damages at trial.

      4.  <u>Conclusion</u>

For the foregoing reasons, nearly all the *Girsh* factors weigh heavily in favor of approving the Settlement.  Accordingly, the Court will grant Plaintiffs' Motion.

**B.      Motion for Attorneys' Fees**

An award of attorneys' fees is a discretionary matter, considering the unique factors of the case.  *See In re Computron Software*, 6 F. Supp. 2d 313, 321-23 (D.N.J. 1998); *Prudential*, 148 F.3d at 338.  There are two conventional methods of calculating attorneys' fees in class actions – the percentage of recovery method and the lodestar method.  *See Prudential*, 148 F.3d at 332-33.  The percentage-of-recovery method is often favored in cases involving a common fund, because it rewards counsel for success and penalizes counsel for waste or failure.  *Gen. Motors*, 55 F.3d at 821 (3d Cir. 1995).  Meanwhile, the lodestar method is more commonly applied in statutory fee-shifting cases.  *Id.*; *Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321, 323 (D.N.J. 1997).  Here, we have a case for which neither is an exact fit, as there is no set cap on the settlement funds.  Essentially, the amount of fees was negotiated by the parties without respect to the amount of settlement funds available.

Plaintiffs seek $6.5 million in fees and $500,000 in costs, which they state is less than what they have invested in this litigation.  They estimate that their lodestar amount at this point is $11,099,749.25[15] and that attorneys and paralegals have spent 22,557.45 hours on the litigation thus far.  They have also incurred $563,017.84 in costs (or $523,103.15 in nontaxable costs).  Comparing their requested fee to the lodestar estimate results in a "negative" lodestar multiplier of 0.59.  Counsel also argue that the amount of time spent was necessary to achieve the result here and discuss the time spent on, for example, document review, research of case law in several jurisdictions, settlement discussions, and expert analysis.  In addition, they note that they will continue to spend time on the case facilitating the settlement.

---

[15]      In Plaintiffs' original submission, the lodestar rate was calculated solely based on current billing rates and came to $11,598,933.75.  At the Final Fairness Hearing, the Court asked the Plaintiffs to calculate the lodestar amount using historical rates, and that number appears here.

Comparing the requested fees to a percentage recovery amount, the requested fees also appear reasonable.  The Third Circuit Court of Appeals has held that district courts "must consider" ten factors "[i]n determining what constitutes a reasonable percentage fee award[.]"  *In re Diet Drugs,* 582 F.3d 524, 541 (3d Cir. 2009). The factors are:

> (1) the size of the fund created and the number of beneficiaries;

> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;[16]

> (3) the skill and efficiency of the attorneys involved;

> (4) the complexity and duration of the litigation;

> (5) the risk of nonpayment;

> (6) the amount of time devoted to the case by plaintiffs' counsel;

> (7) the awards in similar cases;

> (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;

> (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and

> (10) any innovative terms of settlement.[17]

*Id.* (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir. 2000), and *Prudential,* 148 F.3d at 336–40).  As of the date the motion for fees was filed, DuPont had already paid out $377,706,351.64 to 24,524 claimants.  Adding in attorneys' fees, costs, settlement administrative costs, and proposed incentive awards, the total comes to $388,240,515.64, which means that the requested fees represent less than 2% of the total

---

[16]     The Court received only one objection to the fees in this case, and that objection was simply a comment that the fees are excessive without any explanation of why or how the fees are excessive.

[17]     Factors 1, 3 and 4 are covered in the discussion of the fairness of the settlement and class certification.  Factor 6 was discussed when examining the lodestar calculation.

settlement recovery thus far, and that percentage will get smaller as more claims are paid.  In comparable settlement cases, awards as high as 5% have been accepted, and 2% is far lower than the standard 30% contingency fee.  *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 350 (N.D. Ga. 1993) ($305 million fund, 5.25% fee award); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3d Cir. 2001) (chart of mega-fund settlements, showing fees ranging from 2.8% to 36%).

Counsel also argue that they added substantially beneficial elements to the established DuPont claims process, such as an extended warranty, a more limited release of claims, an appeals process, and publication of DuPont's tree payment schedule.  They add that the settlement is innovative because claims are already being paid prior to settlement approval, and because even if the settlement is not finalized, all of the additional benefits negotiated by counsel will be retained by class members, with the exception of the right of appeal to an independent arborist.

Counsel also ask that incentive awards be granted to class representatives ($1500 for individual property owners, $2500 for commercial entities).  Incentive awards "compensate named plaintiffs for 'the services they provided and the risks they incurred during the course of class action litigation.'"  *Bredbenner v. Liberty Travel,* Civil Action No. 09-905, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011)  (quotation omitted).  Incentive awards also "'reward the public service' of contributing to the enforcement of mandatory laws."  *Id.* (quoting *In re Cendant,* 232 F.Supp. 2d 327, 344 (D.N.J. 2002)).  At the Final Fairness Hearing, Settlement Counsel stated that the class representatives assisted in the progress of this litigation by, for instance, providing information necessary to file initial complaints, collecting and producing documents, and going through and reporting on multiple inspections of their properties.  *See*

9/27/13 Tr. at 101:24-103:4.  These awards appear to be in line with previous awards in other class action litigation.  *See, e.g., Hall v. Best Buy*, 274 F.R.D. 154, 173-174 (approving incentive award of $5,000 per named plaintiff); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) ("If the named plaintiff was deposed, the named plaintiff's incentive payment will be $5,000; if the named plaintiff was not deposed, the named plaintiff's incentive payment will be $2,500."); *Klingensmith v. Max & Erma's Restaurant*, Civil Action No. 07-0318, 2007 WL 3118505, at *5 n.13 (W.D. Pa. Oct. 23, 2007) ("[T]he class representative's award of $2,500 in this action raises no 'red flag' when it is properly considered as a necessary incentive to aid in enforcement of legislation, and as compensation to an individual willing to contribute her name and time to this purpose."); *In re Smithkline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535 (E.D. Pa. 1990) (approving $ 5,000 awards for nine representatives in case involving more than 22,000 claimants and a settlement of $ 22 million).

For these reasons, then, the Court will approve both the requested attorneys' fees and costs and the incentive awards for class representatives.

CONCLUSION

For the foregoing reasons, the Court will grant the Plaintiffs' Motion for Final Approval and Motion for Attorneys' Fees.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE